We'll hear argument first this morning in Case 08-1448, Schwarzenegger v. Entertainment Merchants Association. Mr. Morazzini. Mr. Chief Justice, and may it please the Court. The California law at issue today before this Court differs from the New York law at issue in Ginsburg in only one respect. Where New York was concerned with minors' access to harmful sexual material outside the guidance of a parent, California is no less concerned with a minor's access to the deviant level of violence that is presented in a certain category of video games that can be no less harmful to the development of minors. When this Court in Ginsburg crafted a rule of law that permits States to regulate a minor's access to such material outside the presence of a parent, it did so for two fundamental reasons that are equally applicable this morning in this case. First, this rule permits parents' claim to authority in their own household to direct the upbringing and the development of their children. And secondly, this rule promotes the State's independent interest in helping parents protect the well-being of children in those instances when parents cannot be present. So this morning, California asked this Court to adopt a rule of law that permits States to restrict minors' ability to purchase deviant violent video games that the legislature has determined can be harmful to the development and upbringing of minors. What's a deviant violent video game as opposed to a, what, a normal violent video game? Yes, Your Honor. A deviant would be departing from established norms. Are there established norms of violence? Well, I think if we look back — I mean, some of the Grimm's fairy tales are quite grim, to tell you the truth. Agreed, Your Honor. But the level of violence— Are they okay? Are you going to ban them, too? Not at all, Your Honor. What's the difference? I mean, if you are supposing a category of violent materials dangerous to children, then how do you cut it off with video games? What about films? What about comic books, Grimm's fairy tales? Why are video games special? Or does your principle extend to all deviant violent materials in whatever form? No, Your Honor. That's why I believe California incorporated the three prongs of the Miller standard. So it's not just deviant violence. It's not just patently offensive violence. It's violence that meets all three of the terms set forth in the— I think that misses Justice Ginsburg's question, which was, why just video games? Why not movies, for example, as well? Sure, Your Honor. The California legislature was presented with substantial evidence that demonstrates that the interactive nature of violent video games, where the minor or the young adult is the aggressor, is the individual acting out this obscene level of violence, if you will, is especially harmful to minors. It— Would you actually have studies that show that video games are more harmful to minors than movies are? Well, in the record, Your Honor, I believe it's the Gentile and Gentile study regarding violent video games as exemplary teachers. The authors there note that video games are not only exemplary teachers of pro-social activities, but also exemplary teachers of aggression, which was the fundamental concern of the California legislature in enacting this statute. So while the science is continually developing, indeed, it appears that studies are being released every month regarding the— And suppose— Suppose a new study suggested that movies were just as violent. Then presumably California could regulate movies just as it could regulate video games. Well, Your Honor, there is scientific literature out there regarding the impact of violent media on children. In fact, for decades, the President, Congress, the FTC, parenting groups have been uniquely concerned with the level of violent media available to minors that they have ready access to. I don't know, is that answering Justice Kagan's question? One of the studies, the Anderson study, says that the effect of violence is the same for a Bugs Bunny episode as it is for a violent video. So can the legislature now, because it has that study, say we can outlaw Bugs Bunny? No. And there are people who would say that a cartoon has very little social value. It's entertainment, but not much else. This is entertainment. I'm not suggesting that I like this video, the one at issue that you provided the 5-minute clip about. To me, it's not entertainment, but that's not the point. To some, it may well be. Justice Sotomayor, cartoons do not depart from the established norms to of a level of violence to which children have been historically exposed to. We believe the level of violence in these video games. Scalia, that same argument could have been made when movies first came out. They could have said, oh, we've had violence in Grimm's Fairy Tales, but we've never had it, you know, live on the screen. I mean, every time there's a new technology, you can make that argument. Well, Your Honor, I think that's the beauty of incorporating the three prongs of the Miller standard into California's law. This standard is very prophylactic and ensures that only a narrow category of material will be covered. Certainly not in a very.  Now, is this any different than what we said we don't do in the First Amendment field in Stevens, where we said we don't look at a category of speech and decide that some of it has low value? We decide whether a category of speech has a historical tradition of being regulated. Now, other than some State statutes that you point to, some of which are very clearly the same as those that we struck down in Wynn, where's the tradition of regulating violence? Your Honor, California submits that when the rights of minors are at issue and not the rights of adults, the standard should be more flexible. The Constitution should recognize that when the audience is minors, the same standard should not apply. Therefore, the question should not be whether or not historically violent speech was regulated, but whether or not the Constitution guarantees minors a right to do so. Sotomayor, could you get rid of rap music? Have you heard some of the lyrics of some of the rap music? Some of the original violent songs that have been sung about killing people and about other violence directed to them? I would agree it's agreed to, Justice Sotomayor. However, why isn't that obscene in the sense that you're using the word, or deviant? I'm not sure initially that it's directly harmful to the development of minors in the way that we know that violent video games can be. We know that violent material, like sexual material, appeals to a base instinct in especially minors. It has to be presented in a manner where no one is talking about it. Alito, what age group are you talking about? If a video game manufacturer has to decide under your statute how to, where its game stands, what age of a child should the manufacturer have in mind, a 17-year-old, a 10-year-old? Your Honor, I would submit that just like in the obscenity context for minors, a law similar to the New York law at issue in Ginsburg, though California's law hasn't been construed or applied, I would submit that the jury would be instructed to consider minors as a whole. In California, that's under 18 years old. So I believe they would just be instructed minors as a class. Alito, how can they do that? Isn't the average person likely to think that what's appropriate for a 17-year-old may not be appropriate for a 10-year-old or an 8-year-old? Your Honor, I think juries and judges do this every day in the variable obscenity context. But California doesn't do that. California has in big letters 18, so it's not 7, is it okay for a 7-year-old? Is it okay for a 12-year-old? Part of the statute requires labeling these video games in big numbers, 18. So it's 18, and California doesn't make any distinctions between 17-year-olds and 4-year-olds. Justice Ginsburg, and I think rightfully so, I think a jury would be charged with perhaps the standard of what the community believes an average minor. So the manufacturer would consider. Scalia, is it 9 years old? Fair point, Justice Scalia. I think a jury could be instructed as to the typical age group of minors that are playing these games. Breyer, why wouldn't you, if necessary, simply say that a video game that appeals to the prurient, shameful, or morbid interests of those 18 or under, but let's take 18, and it's not suitable in the community for those 18, and it has no redeeming importance of any kind, no serious literary, artistic, political, or scientific value for those 18, that at least as to those, you can't sell it without the parent can buy it, but the child can't buy it. So you can't sell to a 12-year-old something that would be horrible for an 18-year-old. Is that what you would be willing to accept that, if necessary, to make this okay  Justice Breyer, absolutely. Okay. Kagan. Mr. Marazzini, could I take you back to Justice Scalia's original question, which was what counts as deviant violence or morbid violence? Because I read your briefs all the way through, and the only thing that I found was, you said, was clearly covered by the statute, was Postal 2. But presumably the statute applies to more than one video game. So what else does it apply to? How many video games? What kind of video games? I mean, how would you describe in plain English what morbid violence is, what you have to see in a video game for it to be covered? Okay. Justice Kagan, I would go back to the language of the statute. And the statute covers video games where the range of options available to the player includes maiming, killing, dismembering, torturing, sexually assaulting, and those types of violence. So I would look to games where So anything that has those kinds of violence counts. No. And then we would move to the three prongs of the Miller standard, Your Honor. We would look to see. Well, so how do we separate violent games that are covered from violent games just as violent that are not covered? Well, Your Honor, I think a jury could be instructed with expert testimony, with video clips of gameplay, and to judge for themselves whether they're I'm not concerned about the jury judging. I'm concerned about the producer of the games who has to know what he has to do in order to comply with the law. And you're telling me, well, a jury can, of course a jury can make up its mind, I'm sure. But a law that has criminal penalties has to be clear. And how is the manufacturer to know whether a particular violent game is covered or not? Well, Your Honor, if we look at Would he convene his own jury and try it before, you know, I really wouldn't know what to do as a manufacturer. Justice Scalia, I'm convinced that the video game industry will know what to do. They rate their video games every day on the basis of violence. They rate them for the intensity of the violence. So is what's covered here, the mature category and the ratings, is that what the statute covers? Is that what it's meant to cover? I believe that some mature-rated games would be covered, but not all. Some, but not all. But not all. Your Honor, just like with sexual material, we can trust individual panderers of sexual material to judge whether or not it's a, it's an Well, let me just make one comment on that point. It seems to me all, or at least the great majority of the questions today, are designed to probe whether or not this statute is vague. And you say the beauty of the statute is that it utilizes the categories that have been used in the obscenity area, and that there's an obvious parallel. The problem is, is that for generations there has been a societal consensus about sexual material. Sex and violence have both been around a long time. But there's a societal consensus about what's offensive for sexual material. And there are judicial discussions on it. Now, those judicial discussions are not precise. You could have had the same questions today with reference to an obscenity statute. And we have said that with reference to obscenity, there are certain that there are certain materials that are not protected. Those rules are not precise at the margins, and some would say not precise in a more significant degree as well. But you're asking us to go into an entirely new area, where there are no consensus, no judicial opinions. And this is and this indicates to me the statute might be vague. And I just thought you'd like to know that reaction in my mind. Justice Kennedy, as with sexual, the regulation of sexual material and obscenity, we had to start somewhere. California is choosing to start now. We can build a consensus as to what level of violence is in fact patently offensive for minors. What level of violence is deviant for minors, just as the case law has developed over time with sexual depictions? Your Honor, I believe the key is the similarities violence has with sex. This is material. Scalia. What about excessive glorification of drinking, movies that have too much drinking in it? Does that have an effect on minors? I suppose so. I am not just concerned with the vagueness. I am concerned with the vagueness, but I'm concerned with the First Amendment, which says Congress shall make no law abridging the freedom of speech. And it was always understood that the freedom of speech did not include obscenity. It has never been understood that the freedom of speech did not include portrayals of violence. You're asking us to create a whole new prohibition, which the American people never ratified when they ratified the First Amendment. They knew there were, you know, obscenity was bad, but what's next after violence? Drinking, smoking, movies that show smoking can't be shown to children? Will that affect them? Of course, I suppose it will. But is that — are we to sit day by day to decide what else will be made an exception from the First Amendment? Why is this particular exception okay, but the other ones that I just suggested are not okay? Well, Justice Scalia, I would like to highlight the fact that the material at issue in Ginsburg was not obscene. Under no existing definition of obscenity was the partial nudity that this Court allowed States to regulate minors' access to. So it was not — Scalia wants to know is what James Madison thought about video games. Did he enjoy them? No. I want to know what James Madison thought about violence. Was there any indication that anybody thought when the First Amendment was adopted that there was an exception to it for speech regarding violence? Anybody? Your Honor, as to minors, I believe looking at some of the historic statutes States had passed, had enacted in the past, there was a social recognition that there is a level of violence. What's the earliest statute? Pardon? What's the earliest statute and how much enforcement was under it? Your Honor, I don't know the earliest statute off the top of my head. I believe they go back into the early 1900s, perhaps later. I apologize. Breyer. On the principle, I mean, it's been quite some years, hasn't it, before the — since this Court has held that one instance that courts, that the country legislatures can regulate, are fighting words. And we regulate fighting words, don't we, because they provoke violence. And the American Psychological Association and the American Pediatric Association have said that certain kinds of video games here create violence when children are exposed. There are 80 people who think to the contrary. There are two huge things of meta-studies that think not to the contrary. All right. So what are we supposed to do? Well, Justice Breyer, I think in going back to Justice Scalia's question, I find it hard to believe, and I know of no historical evidence that suggests that our founding fathers, in enacting the First Amendment, intended to guarantee video game retailers a First Amendment right. Let's go back to what Justice Breyer was asking, because this Court, with respect to the fighting words, Chaplinsky, in your face, provoke an immediate reaction. The Court has been very careful to cordon that off so it doesn't have this spillover potential. So you didn't latch on to fighting words. Your analogy is to obscenity for teenagers, as I understand it. Yes, Justice Ginsburg. With regard to fighting words, the societal interest in preventing acts of violence is different than the concern at issue here today. So could I just make sure I understand that, Mr. Marzini, because I understand the State has given up its argument that the interest protected by this law is an interest in preventing minors who see these games from going out and committing violent acts themselves, that the State is not saying that that's the interest in the law, is that correct? That instead the State is saying that the interest in the law is in protecting children's moral development generally. Justice Kagan, we welcome that as an effect of California's regulation, but the primary interest was the internal intrinsic harm to minors. That's what the State of California is deeply concerned with in this case. Sotomayor, I have a point of clarification. Justice Ginsburg talked about the labeling parts of this Act. The circuit court struck those portions of the Act. You have not challenged that ruling. There are two sections to the Act. One is a criminal act for selling to a minor. And the other is a requirement that you label in a certain way each video. The district court said both were unconstitutional. I think the circuit court said both were unconstitutional, correct? Yes, Justice Sotomayor. And your brief has not addressed the labeling requirements at all. Well, we didn't, Your Honor, because one holding of the Ninth Circuit hinged upon the other. In striking down the body of California's law, the restriction on the sale, the court found that since it's not illegal to sell these games to 18-year-olds, that the governmental purpose served behind the label itself was in fact misleading. So under the Zadur case law, I don't have the case site before me, but under Zadur regarding lawyers' advertising of services, it's the government can require the labeling so long as it's necessary to prevent misleading the consumer. The Ninth Circuit found that because they struck down the body of our law, that the 18 label would be misleading. So that's a interesting concession on your part, that the labeling doesn't have a need separate from the restriction on sale. I would have thought that if you wanted a lesser restriction, that you would have promoted labeling as a reasonable scrutiny restriction to permit the control of sale of these materials to minors, but you seem to have given up that argument altogether. Justice Sotomayor, I certainly did not attempt or intend to concede that the Ninth Circuit's opinion was correct in any sense. Well, you have conceded it by not appealing it, but okay. We're not your case on labeling rises and falls on the sale to minors. At this point, I would agree, Your Honor. I gather that if the parents of the minor want the kid to watch this violent stuff, they like gore, they may even like violent kids, then the State of California has no objection, right? So long as the parent buys the thing, it's perfectly okay. Your Honor, under Ginsburg, they're entitled to direct the development and the upbringing of their children in the manner they see fit. It's important to the State of California that the parent can be ensured that the children can involve themselves in this important decision. So that's basically, all this is, is a law to help parents, is that right? It's one of the two fundamental interests that are served by this law, yes, ensuring that parents can involve themselves. And the front end, California sought to erect a barrier in between a retail sales clerk and a minor with regard to violent material, just as we allow for minors access to sexual material. Because California sees that the developmental harm that can be caused to minors is no less significant than that recognized by this Court in Ginsburg with regard to minors' exposure to sexual material. Now, again, the material at issue in Ginsburg was not a piece of the same. Alitoso, do you think there's any barrier in California to minors' access to sexual material? I believe California has a law, Penal Code Section 313.1. Ginsburg, California has a Ginsburg-type law. Yes. Did your office spend a lot of time enforcing that? I'm not aware, Justice Alito. But there is a prescription on the sale of sexual material to minors. It's defined as harmful to minors, similar to California's Act. In fact, California's Act, in incorporating the three prongs of Miller, goes even further than the Ginsburg law at issue in Ginsburg. Is there — you've been asked questions about the vagueness of this and the problem for the seller to know what's good and what's bad. Does California have any kind of an advisory opinion, an office that will view these videos and say, yeah, this belongs in the, what did you call it, deviant violence,  and is there any kind of opinion that the seller can get to know which games can be sold to minors and which ones can't? Not that I'm aware of, Justice Ginsburg. You should consider creating such a board. You might call it the California Office of Censorship. It would judge each of these videos one by one. That would be very nice. Well, Your Honor, we ask juries to judge sexual material and its appropriateness for minors as well. I believe that if we can view the level. Do we let the government do that? Juries are not controllable. That's the wonderful thing about juries, also the worst thing about juries. But do we let government pass upon, you know, a board of censors? I don't think so. Justice Scalia, California is not doing that here. The standard is quite similar to that in the sexual material realm. California is not acting as a censor. It is telling manufacturers and distributors to look at your material and to judge for yourselves whether or not the level of violent content meets the prongs of this definition. I can see your white light on that. Even if we get past what I think are difficult questions about vagueness and how to interpret this law, isn't there a less restrictive alternative with a V-chip? Your Honor, I believe you are referring to the parental controls that are available in some of the new machines. As we submitted in our briefing, a simple Internet search for bypassing parental controls brings up video clips instructing minors and young adults how to bypass the parental controls. So V-chips don't work. I believe the V-chip is limited to television, Justice Kennedy. If I could reserve the remainder of my time. Thank you, Mr. Morazzini. Thank you. Mr. Smith. Mr. Chief Justice, and may it please the Court, the California law at issue restricts the distribution of expressive works based on their content. California, as we've heard today, does not seriously contend that it can satisfy the usual First Amendment standards that apply to such a law. Instead, it's asking this Court to grant it a new free pass, a brand-new Ginsburg-like exception to the First Amendment that would deny constitutional protection to some ill-defined subset of expressive works. And I submit not just video games, but necessarily movies, books, and any other expressive work that describes or portrays violence in a way that some court somewhere someday would decide is deviant and offensive. What about the distinction between books and movies may be that in these video games, the child is not sitting there passively watching something. The child is doing the killing. The child is doing the maiming. And I suppose that might be understood to have a different impact on the child's moral development. Well, Your Honor, it might. The State of California has not marshaled a shred of evidence to suggest it's true. And if you look at the social science. What was the state of the record that was present before the Court in Ginsburg? The state of the record was that they were aware of science on both sides, but made a judgment that as a matter of common sense, they could decide that obscenity, even somewhat enlarged obscenity. The Court acted on the basis of common sense? Yes, and said as long as there's science on both sides. But in that particular area, which is an exception based that goes back to the founding, they felt that it was proper for them to adjust the outer boundaries of the obscenity. But the material wasn't obscene. They were girly magazines. I imagine to today's children they would seem rather tame, the magazines involved. But they were definitely not obscene with respect to adults. Well, Your Honor, that's certainly true. But one of the things about the case that's important to recognize, they didn't pass on the particular material before the Court. They simply said, is this somewhat larger definition of variable obscenity going to be acceptable to her? We're talking about common sense. Why isn't it common sense to say that if a parent wants his 13-year-old child to have a game where the child's going to sit there and imagine he's a torturer and impose gratuitous, painful, excruciating, torturing violence upon small children and women, and do this for an hour or so, and there is no social or redeeming value, it's not artistic, it's not literary, et cetera, why isn't it common sense to say a State has the right to say, parent, if you want that for your 13-year-old, you go buy it yourself, which I think is what they're saying. Well, Your Honor, the State has to have some reason to think that parents are already It does. It does. What it has is, and I've looked at the studies perhaps not as thoroughly as you, but it seemed to me that Dr. Ferguson and Dr. Anderson are in a disagreement, that they aren't in that much of a disagreement, actually, but they've looked at depth in a whole lot of video games, not movies they're talking about or other things they're talking about, video games. And both groups come to the conclusion that there is some tendency to increase violence, and the American Psychiatric Psychological Association, the American I think it's the Anderson side, that this does hurt children. I have to admit that if I'm supposed to be a sociological expert, I can't choose between them. But if I can say, could a legislature have enough evidence to think there's harm, the answer is yes. There's two aspects of harm. The one I was about to address was the question of whether parents need additional help in exercising the role that they have played throughout the history of the country. Yes. They need additional help because many parents are not home when their children come home from school. Many parents have jobs, we hope, and when their children are there, they do what they want. And all this says is if you want that gratuitous torture of, let's say, babies to make it as bad as possible, what you do, parent, is you go buy it. Don't let him buy it on his own. And he's 13 years old. Now, what's the common sense or what's the science of that? Well, two aspects. With respect to parental controls, Your Honor, there's a whole variety, whole series of things that parents have available to them and are using today to deal with any concerns that they have about what's appropriate for their families. I don't want to interrupt your answer, but any 13-year-old can bypass parental controls in about 5 minutes. That is one element of about five different elements, Your Honor. And if I could talk about them, there is the ratings. Parents are doing the purchasing 90 percent of the time. Even if the child does the purchasing, they bring the game home, the parent can review it. The game is being played in the home on the family television or computer most of the time. Any harm that's supposed to be inflicted on them is supposed to take place over a period of years, not minutes. So the parent has ample opportunity to exercise parental supervision over what games are being played in the house. Plus, there is the parental controls, which are very similar to the ones that the Court has found to be significant in the Playboy case, in the COPA case, in a whole variety of cases. How much do these videos cost? They cost in the range of $50 to $60 when new, Your Honor. Not too many 13-year-olds walk in with a $50 bill, do they? It seems very likely that the people, if there are any out there buying games without parental permission, which the State, by the way, has not even tried to show, they are very likely in the 16-year-old category. You're away from the common sense. If you're going to go back to the common sense of it, what common sense is there in having a state of the law that a State can forbid and says to the parent, if you go in, the child, the 13-year-old cannot go in and buy a picture of a naked woman, but the 13-year-old child can go in and buy one of these video games, as I've described. I've tried to take as bad a one as I could think of. Gratuitous torture of children. Okay? Now, you can't buy a naked woman, but you can go and buy that, you say to the 13-year-old. Now, what sense is there to that? Well, there's various aspects of this that I think it's important to understand. First of all, violence has been a feature of works that we create for children and encourage them to watch throughout the history of this country. We have a very different sense of whether violence, per se. Breyer's love is not something that people have tried to encourage children to understand and know about? I mean, what's the difference between sex and violence, both, if anything? There's a huge difference. The difference is we do not. We do not. The difference is we do not make films for children in which explicit sex happens. We do make films for children in which graphic violence happens. Graphic violence, there is a difference. We do not have a tradition in this country of telling children they should watch people actively hitting schoolgirls over the head with a shovel so they'll beg with mercy, being merciless and decapitating them, shooting people in the leg so they fall down, pour — I'm reading from the district court description — pour gasoline over them, set them on fire and urinate on them. We do not have a tradition in this country. We protect children from that. We don't actively expose them to that. And parents have been doing that for — since time immemorial. The question before this Court is whether you're going to create an entirely new exception under the First Amendment, whether parents need to have such a new exception created, and whether or not if you're going to do it, you could possibly figure out what the scope of that exception is. Roberts Is it your position — I know this is a facial challenge, Mr. Smith. So is it your position that the First Amendment could not prohibit the sale to minors of the video game that I just described? Smith My position is that most people would think that that's an inappropriate game for minors. We do not try to sell it to minors, but that the Constitution should not be— Roberts Oh, I know you don't, but I — what is — you're avoiding the answer. Does the First Amendment protect the sale of that video to minors, a minor? Smith Is that there is not a violence exception to the First Amendment for minors and there should not be. Roberts So your position is that the First Amendment does not, cannot, no matter what type of law, whether this one is vague or not, that the State legislature cannot pass a law that says you may not sell to a 10-year-old a video in which they set school girls on fire? Smith And the reason for that is there's no possible way, it's an insuperable problem to use the English language to draw up an exception to the Constitution to the First Amendment. Alito What if a State passed a Stat — what if California took the list of video games that your association rates as mature and said there's a civil penalty, and you apparently don't want your — you don't want vendors selling those games to minors, isn't that right? Smith Exercising our First Amendment rights, we have decided— Alito You don't want that. And now what if California said there's a civil penalty attached to that? Smith What that would do is transform the ESRB, the private voluntary system that the censorship commission that this Court struck down in interstate circuit. When the government does that and you have to go to them for permission to allow kids into the movies or to play this game, it's a prior restraint. You have way too much discretion. It's a licensing authority that the First Amendment doesn't allow. Alito You seem to argue that there really is no good reason to think that exposure to video games is bad for minors, exposure to really violent video games is bad to minors. Is that right? Smith I think it's important to draw a distinction between harm that could be cognizable under the law and appropriateness. Families have different judgments that they make about their children at different ages and with different content and different family values. And that's what— Kagan Well, Mr. Smith, is there any showing that the State could make that would satisfy you, that would say, yes, that's a sufficient showing for this law to go forward? You know, I understand that you think that the current studies don't suggest much of anything about harm. Smith No, they don't. Kagan But are there studies that would be enough? Smith Well, I guess I can imagine a world in which expression could transform 75 percent of the people who experience it into murderers. That's clearly not the way the human mind works. And here the reality is quite the opposite. Dr. Anderson testified in the Illinois trial, which is in the record, that the vast majority of people playing the games will grow up and be just fine. And in fact, he acknowledged that the effects of these games are not one whit different from watching cartoons on television or reading violent passages in the Bible or looking at a picture of a gun. Scalia You really don't want to argue the case on that ground? I gather you don't believe that the First Amendment reads, Congress shall make no law abridging the freedom of speech except those that make sense. Is that it? Smith Your Honor, my main ground today is exactly that, that this Court said last year in the United States v. Stevens it doesn't have a free-willing authority to create new exceptions to the First Amendment after 200 years based on a cost-benefit analysis, and that this is a test of that. This is exactly what the State of California is asking you to do. Alito But we have here a new medium that cannot possibly have been envisioned at the time when the First Amendment was ratified. It is totally different from – it's one thing to read a description of, as one of these video games is promoted as saying, what's black and white and red all over? Perhaps the answer could include disposing of your enemies in a meat grinder. Now, reading that is one thing. Seeing it is graphically portrayed. It's entirely different. Scalia And doing it. Alito And doing it is still a third thing. So this presents a question that could not have been specifically contemplated at the time when the First Amendment was adopted, and to say, well, because nobody was – because descriptions in a book of violence were not considered a category of speech that was appropriate for limitation at the time when the First Amendment was violated is entirely artificial. We do have a new medium here, Your Honor, but we have a history in this country of new mediums coming along and people vastly overreacting to them, thinking the sky is falling, our children are all going to be turned into criminals. It started with the crime novels of the late 19th century, which produced this raft of legislation which was never enforced. It started with comic books and movies in the 1950s. There were hearings across the street in the 1950s where social scientists came in and intoned to the Senate that half the juvenile delinquency in this country was being caused by reading comic books. And there was enormous pressure on the industry. They censored – they self-censored. We had television. We have rock lyrics. We have the Internet. Kagan Mr. Smith, do you think all video games are speech in the first instance? Because you could look at these games and say they're the modern-day equivalent of Monopoly sets. They're games. They're things that people use to compete. You know, when you think about some of them, the first video game was Pong. It was playing tennis on your TV. How is that speech at all? The games that we're talking about have narrative events that are occurring, characters, plot. And that's exactly what the State has set out to regulate here. It says if these events occur here, there is violence, one person is hurting another person, it has to be a human being who's the victim, and it's doing it in a way that they find offensive in some way, we're going to regulate it. So obviously what's going to happen is we're going to separate video games into narrative video games and non-narrative video games. You don't have to as long as the law is limited to regulating narrative. That's what this law is limited to. Now, if the law said you shouldn't buy or play games that have red images that appear in them or something else that was somehow non-content based, that might be a closer case. Scalia. What about a law that says you can't sell to minors a video game, doesn't care what the plot is, but no video game in which the minor commits violent acts of maiming, killing, setting people on fire? What about that? Would that be regulating speech? Well, of course, Your Honor. That's exactly what the law says. It's not speech. You're saying you just can't let the kid maim, kill, or set on fire. I'm sorry. What the law would be directed at is not the plot, not the video game. Itself, but the child's act of committing murder, maiming, and so forth. Well, the events in a video game are a couple of the what happens in the plot is a combination of what the game gives you and what the player adds to it. There's a creative aspect coming at it from the other side. It's often referred to as a dialogue between the player and the game. I would submit that both are completely protected by the First Amendment, just as a person acting. If the child is speaking to the game? No. The child is helping to make the plot determine what happens in the events that appear on the screen, just as an actor helps to portray what happens in a play. You are acting out certain elements of the play, and you're contributing to the events that occur, and adding a creative element of your own. That's what makes them different and in many ways wonderful. Roberts, your challenge is a facial challenge? Yes, Your Honor. So that under whether you use the Salerno test or the Glucksberg test, if there is either one or any applications that would satisfy the Constitution, the facial challenge fails, right? It's very clear under the law in this Court that those tests don't apply in a First Amendment context. I thought we referenced them last year in the Stevens case, and the only reason we didn't have to decide which applies is because we adopted an approach that looked at overbreadth and said this statute is overbroad, and specifically didn't decide whether it could be applied in that case to crush videos. That's correct, Your Honor, but I think there's no argument here, I don't think, that if you can find one game out there to which this can constitutionally be applied, even though it would also be unconstitutionally applied to the vast run of other games. Well, I understand the tenor of much of the questioning, I think, is that there may be games, and may be minors, may be a less violent game sold to a 17-year-old. Perhaps that violates the First Amendment, but something like Postal 2 sold to a 10-year-old might well not violate the First Amendment to apply this law to that. And the way we approached the issue in Stevens, where we had hunting videos and crush videos, would say that it's too broad to apply the law to everything, so we strike it down, it's overbroad, but leave open the possibility that a more narrowly drawn statute might pass muster. Why isn't that a good approach? You certainly could do that. Certainly the key thing is that you strike down this law, because this law is clearly much broader than any one game. I would submit to you, though, that there's no way, in fact, anybody's going to be able to come back and draw a statute that gets to what they claim, because the English language is not susceptible of that level of precision. Breyer. If it's not susceptible, throughout you've been arguing your point, which is fair. You have some experts who favor you, and you make that point very strongly, and your point's a pretty good one and a serious one, that it's very hard to draw this line under traditional First Amendment standards. But I'd like you to deal with their point for a moment, and I take it their point is there is no new First Amendment thing here. There is a category, call them X, which really are involving things like torturing children, et cetera. Maybe you don't like to sell them to anybody. You have an X or some special thing, but they exist, and they fit within a Miller type definition. They are much worse than the simple girly magazine that was involved there. And they will use traditional First Amendment tests, that is to say, there is speech at issue, that speech is being limited, it is being done for a good reason, compelling interest, namely, this problem with the X videos and the torture, and living it through, and there is no less restrictive alternative that isn't also significantly less effective. See, I want you to deal with that directly, because what you've been doing for the most part is saying we'd have to be in some new, total new area, et cetera. But their argument is you don't have to be in some totally new area, et cetera. Apply traditional First Amendment standards and we win. That's their argument, and I'd like to hear what you have to say about that specifically. Your Honor, they do not suggest that there is any existing exception to the First Amendment that would apply to this. This is not an exception. It is the traditional strict scrutiny First Amendment test. Well, they make a feint at trying to argue that. All right. Then let's, to make, to get you to focus on it, I'll say I've made the argument. There you go. Your Honor, I think if you apply strict scrutiny here, they do not come close to the kind of showing that would be required. Under the First Amendment. First of all, they have not shown any problem, let alone a compelling problem, requiring regulation here. In a world where parents are fully empowered already to make these calls, where crime, including violent crime since the introduction of these games, has been plummeting in this country. Down 50% since the day Doom first went on the market 15 years ago. In a world where parents are fully aware of what's going on in their homes and aware of the rating system and can use all the other tools that we have talked about. Why couldn't you make the same arguments with respect to the obscenity statutes? Well, Your Honor, because obscenity doesn't have strict scrutiny applied to it. If it did, I expect you could make the same arguments if there were. Why shouldn't violence be treated the same as obscenity? Well, because, first of all, we don't have the same history of it. There's no historical pedigree of that kind of exception. And as I was suggesting earlier, there's a fundamental difference factually, which is Ginsburg works tolerably well because we take everything that's sexually explicit and appeals to a prurient interest, and we say over here it's not appropriate for minors. Violence would require you to draw a much different line between acceptable protected violence and unacceptable unprotected violence for minors. And given the lack of a historical pedigree, but also just given the nature of what you're trying to do, that's a situation. Kennedy, the Court struggled for many, many years and are to some extent still struggling with obscenity. They came up with basically what we might call the Miller standards, and the State has said this gives us a category that we can work with with reference to violence. And if you take the Miller standards and you take two things out of it, you take out of it explicit sex and nudity, and you take out of it appeal to prurient interest, what do you have left? You have left what you have as a structure with no apparent meaning. There is no way to know how a court would apply a standard like deviant violence, morbid violence, offensive violence, let alone decide which video games have a redeeming social, political, artistic value. The value of a video game is completely in the eye of the beholder. Some would say they're beautiful works of artistic creation, others would say they're beautiful works of artistic creation. Kennedy, you could make all those arguments with reference to obscenity. Except that you know, we know, we all know, at least with respect to Ginsburg, adult obscenity, I would acknowledge, is a very difficult line. Ginsburg works reasonably well because if it has sex in it, naked people having sex in it, and it's designed to be appealing to people's prurient interests, you don't give it to minors, and you don't have a lot of cases out there about that. Scalia, when you start in Ginsburg with something that is proscribable even with regard to adults, you know that there is such a thing as obscenity, which can be proscribed even as to adults, whereas in this case, I don't know that there is such a thing as morbid violence, which could be eliminated from ordinary movies. Let me — I think a little history is helpful here. This Court has twice dealt with laws attempting to regulate violent works in the past. One was in Winters v. New York, where law applied to magazines and books, and one was in the 1960s on the very day Ginsburg came down in the Interstate Circuit case. The city of Dallas had an ordinance where there was going to be a commission that was going to review each movie and decide if it was appropriate for children. Alito, let me be clear about exactly what your argument is. Your argument is that there is nothing that a State can do to limit minors' access to the most violent, sadistic, graphic video game that can be developed. That's your argument. Is it or isn't it? My position is that strict scrutiny applies, and that given the facts in the record, given the fact that the problem is already well controlled, parents are already empowered, and there are great less restrictive alternatives out there, there isn't any basis to say strict scrutiny is satisfied. Sotomayor, just to make clear, your answer to Justice Alito is at this point, there is nothing the State can do. Because there is no problem it needs to solve that would justify it. Could I just have a statement? The answer is yes, Your Honor. There is nothing the State can do. Sotomayor, Mr. Smith, how can you say that? There is plenty of proof that children are going into stores and buying these games despite the voluntary rating system, despite the voluntary retailer restraint by some. There is still proof out there, and an abundance of it, that kids are buying the games. And there is proof that some parents, as well-intentioned as they may or may not be, have not been able to supervise that. So I am starting from the proposition that there is a problem, it's a compelling State need, why are you arguing that there is no solution that the State could use to address that problem? The existing solutions are perfectly capable of allowing this problem to be addressed, assuming it is a problem. But it's still about 20 percent of sales are going to kids. That's when they send in somebody who is 16 to test the system. There isn't any evidence at all in this record that actual children, not testers, are in fact disobeying their parents and secretly buying these games, bringing them into the home and playing them for years with their parents unaware of it. There is simply no evidence of that at all. Could you have a law that says the State has to put, the dealers have to put the violent video games in a particular area, the video store? That is not, and then, you know, and minors are not allowed in that area? Well, if what you are saying is you are going to have a limit on the ability of minors to buy them because they are balled off and minors are not going to go and pick them off the shelf, then I don't know how that differs from the current law, Your Honor, assuming you could figure out. Breyer's answer, your answer to the first question of Justice Alito and the Chief Justice was, yes, isn't that, you are saying there is nothing they can do. So now, am I right about that or am I not right? Yes. Strict scrutiny. I am right. Okay. All I wanted was to ask you this. So they can't say, example, all the highest rated videos have to be on the top shelf out of the reach of children. Can they do that? I would think that that's probably what they do. That's what they do with cigarettes or something, isn't it? Except that cigarettes are not speech, Your Honor. This is fully protected. I know that cigarettes are not speech, Mr. Smith. Cigarettes are something that we have determined are harmful to children. The question is, you say the record doesn't support the idea that these video games are harmful to children. Some of us may conclude that it does. Well, certainly the record doesn't support it. The record says that even if you take the studies at face value, it's not one whit more harmful than watching television cartoons. That's what the record shows. But on that score, Mr. Smith, there is a study by the FCC. The question is whether violence can be restricted during the hours when most children are awake, just the way pornography is. I don't remember what are the hours, but something like from 10 in the evening to, I don't know, but didn't the FCC say, yeah, we could do the same thing for violence that we're doing for sex, except we don't think we ought to do it, we think Congress should do it? What they did was they spent several years trying to come up with a definition that would allow anybody to figure out which violent TV shows have to be put into this adult category and which don't, and they eventually punted and said, we have no idea how to do that. Congress asked us to do it. We cannot do it. And they punted it back to Congress to try to come up with a definition. This is a very difficult task, trying to use language to differentiate levels of violence or types of violence in a manner that would in some way tell people what the rules of the game are. I think even if you think that there's some problem out there that needs to be solved, you ought to think very carefully about whether or not you're going to authorize the creation of some new rule authorizing regulation in this area when no one will have any idea what the scope of it is. Alito, you say there's no problem because 16-year-olds in California never have $50 available to go buy a video game, and because they never have TVs in their room and their parents are always home watching what they do with their video games and the parents and the video games have features that allow parents to block access to block the playing of violent video games, which can't be overcome by a computer savvy California child. I don't think there's a problem there, but I don't think there's a problem in the case of a California 16-year-old. That's why there's no problem, right? I guess if what we're really going to do is judge the constitution of this law based on what 16- and 17-year-olds are getting and whether that would be harmful to them, I think the problem there is the line between 16 and 17 and 18 is so fine that you're not going to be able to identify any real category of games that fits into that category. And it's important, by the way, to note that California hasn't told us whether we should judge it 5-year-olds, 10-year-olds, 17-year-olds. If it's 5-year-olds, then it's vastly over-restrictive. If it's 17-year-olds, I suspect it wouldn't restrict anything because nobody is going to be able to convince a jury, well, this is an 18-year-old game, not a 17-year-old game. Roberts. We draw that kind of line, of course, in the death penalty area, don't we? Between 18-year-olds, you're under 18, you can't be sentenced to life without parole. If you're over 18, you can. And we do it for drinking, we do it for driving. But here you're assessing works of expression and trying to decide what age they would correspond to, and I don't think you can cut it that finely and say, well, this is an 18 game, this is only a 17 game. I just don't think that works. So if that's the test, and the test Justice Breyer suggested it ought to be, then the statute essentially would restrict nothing. If the test is 5-year-olds. Breyer, maybe it would restrict the X things, maybe. Maybe it would restrict the total gratuitous torture. And if that's what it restricted, why is that such a terrible thing? And if, as you experimented with other things, as they did in the obscenity area, you could discover you could limit it to that. I think the maybe is telling, though, Your Honor. Somebody, as Justice Scalia pointed out, who's publishing a game has to know what the rules of the game are in advance, subject to hundreds of millions of dollars of penalties. It's $1,000 a game. Penalty, if you were to run a law firm. Well, you have your rules, so why wouldn't the first step be they'd follow your rules? Your rules, the X things, would be limited to people who are over 18. And we'll see if we ever get prosecuted for a different one, and you might never. Our rules wouldn't help you at all. They say that they're only restricting a smaller number, a small subset of M-rated games, which, by the way, we say are appropriate for 17-year-olds. So these ratings that the State wants us to impose are going to conflict with the ratings that are already on the packaging, which are being used by parents every day to make these judgments. So it's actually interfering, the prospect of it would interfere with the information already on the packaging. Roberts.   Roberts. Roberts. Roberts. Roberts. Roberts. Mr. Morazzini, you have 4 minutes remaining. Thank you, Mr. Chief Justice. I wanted to address one point that's been raised about Miners' ability to access these games. Just new games do cost $60, but California's law also regulates the rental of these video games, which is just a few dollars per game. So Miners certainly can't afford them and can't access them. But I also wanted to draw out the point that California's law really is not an ordinance that's directed to a plot of a game. It's expressly directed to games with essentially no plot, no artistic value. This is the helpful nature of the third prong of the Miller standard. So it really is only going after the nature of the game where the child is actually allowed to play. Scalia, if it has a plot, it has artistic value? Is that going to be the test for artistic value? Anything that has a plot? It will be one factor to be considered, Justice Scalia. Well, one factor to be considered, sure. But you're not telling us that so long as it has a plot, it's okay. No, Your Honor. As this Court held in the Jacoblis case, a single quotation from Voltaire on the fly leaf of an otherwise obscene work was not going to make that work non-obscene. You can't have artistic videos that involve maiming and cutting off heads and eviscerating people and pouring gas, right? So long as it's artistic, it's okay. If the level of the violence, just as in obscenity, if the level of the violence causes the game as a whole to lack the artistic, it's a balance, Your Honor, just as it is with sexual material. Each aspect — that's why violence and sex are so similar. Artistic for whom? For a 5-year-old? What a 5-year-old would appreciate as great art? Is that going to be the test? No. Again, minors as a class, so those under 18 years old. Those are the — Do you think mortal combat is prohibited by this statute? I believe it's a candidate, Your Honor, but I haven't played the game and been exposed to it sufficiently to judge for myself. It's a candidate, meaning, you know, yes, a reasonable jury could find that mortal combat, which is, you know, an iconic game, which I'm sure half the clerks who work for us spend considerable amounts of time in their adolescence playing. I don't know what she's talking about. Justice Kagan, by candidate, I meant that the video game industry should look at it, should take a long look at it now, but I don't know off the top of my head. I'm willing to state right here in open court that the video game postal tooth, yes, would be covered by this Act. I'm willing to guess that games that we described in our brief, such as Mad World, would be covered by the Act. I think the video game industry needs to be covered by the Act. Sotomayor, would a video game that portrayed a Vulcan as opposed to a human being being maimed and tortured, would that be covered by the Act? No, it wouldn't, Your Honor, because the Act is only direct towards the range of options that are able to be inflicted on a human being. So if the video producer says it's not a human being, it's an anthroid, computer simulated person, then that doesn't – all they have to do is put a little harder feature on the creature and they can sell the video game? Under the Act, yes, because California's concern – I think this is one of the reasons that sex and violence are so similar. These are base physical acts we're talking about, Justice Sotomayor. So limiting, narrowing our law here in California, there in California, to violence against – violent depictions against human beings. So what happens when the character gets maimed, head chopped off, and immediately after it happens, they spring back to life and they continue their battle? Is that covered by your Act? Because they haven't been maimed and killed forever. It's temporarily. I would think so. The intent of the law is to limit those minors' access to those games. You think so. Isn't that feedback to Justice Scalia's question? Well, Your Honor, this is a facial challenge. This statute has not been applied, has not been even construed by a State or Federal court below, but. Thank you, counsel. Thank you. The case is submitted.